AO 91 (Rev. 5/85) Criminal Complaint          SA J. Edwards, FBI  (313) 965-2323          AUSA J. Berg  (313) 226-9160

# United States District Court

__EASTERN__                    __DISTRICT OF__                    __MICHIGAN__

JAN 3 1 2005

CLERK'S OFFICE
DETROIT

UNITED STATES OF AMERICA                    CRIMINAL COMPLAINT

v.

*ANNE LOCKWOOD, and*
*FUPING LIU.*                    CASE NUMBER:

JOHN CORBETT O'MEARA

I, __SA Jeffrey Edwards__ , the undersigned complainant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief. On or about __June 2004 through August 2004__ , in __Oakland__ County, in the __Eastern__ District of __Michigan__ , defendant(s) did *(Track Statutory Language of Offense)*

> with intent to convert a trade secret that is related to a product that is produced for and placed in interstate commerce, to the economic benefit of anyone other than the owner thereof, and knowing that the offense will injure the owner of that trade secret, knowingly appropriate such information without authorization , transmit such information without authorization, and conspire with each other to commit such appropriation and transmittal of information, and did acts to effect the object of the conspiracy, that is, Anne Lockwood and Fuping Liu conspired and cooperated with each other to appropriate without authorization confidential information pertaining to the process of manufacturing powdered metal connecting rods from the owner thereof. Anne Lockwood and Fuping Liu then transmitted said confidential information to a foreign powdered metal manufacturing company, all in violation of Title 18, United States Code, Sections 1832(a)(1), (a)(2), and (a)(5)

in violation of Title __18__ United States Code, Section(s) __832(a)(1), 1832(a)(2), and 1832(a)(5)__ .
I further state that I am a(n) __Special Agent, Federal Bureau of Investigation__ ,and that this complaint is based on the following facts:

*See Attached Affidavit Hereby Incorporated by Reference.*

Continued on the attached sheet and made a part hereof:     ☒  Yes ☐  No

Signature of Complainant
Special Agent J. L. EDWARDS
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

__1/31/05__
Date

at   __Detroit, Michigan__
City and State

__Hon. Mona K. Majzoub, U.S. Magistrate Judge__
Name & Title of Judicial Officer

Signature of Judicial Officer

# AFFIDAVIT

1.   I, Jeffrey L. Edwards, having been first duly sworn, do hereby depose and state as follows:

2.   I am a Special Agent of the Federal Bureau of Investigation (FBI).  I have been a Special Agent for approximately four (4) months.  I am currently assigned to investigations involving computer crimes, as well as other criminal investigations.

3.   The statements contained in this affidavit are based on information provided by employees of the FBI, employees of other government agencies, cooperating witnesses, and my experience and background as a Special Agent of the FBI.  I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that a violation of Title 18, United States Code § 1832(a)(1), (a)(2), and (a)(5) has been committed by the defendants.

4.   This investigation is based on Title 18, U.S. Code § 1832(a), theft of trade secrets. Section 1832(a) of Title 18 provides that:

> Whoever, with intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will injure any owner of that trade secret, knowingly –

> (1)  steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

> (2)  without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;

1

(3)   receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

(4)   attempts to commit any offense described in paragraphs (1) through (3); or

(5)   conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more such persons do any act to effect the object of the conspiracy,

shall be guilty of an offense against the United States.

A "trade secret" is defined in 18 U.S.C. § 1839(3) as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing, if

(A)   The owner thereof has taken reasonable measures to keep such information secret; and

(B)   The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

The "owner," with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed.

## DETAILS OF THE INVESTIGATION

5.   In conducting this investigation, I have interviewed engineering and management officers of METALDYNE CORPORATION.  I have also reviewed numerous METALDYNE

records, including emails, personnel records, technical documents, and contracts.  The information contained herein is based in part on the interviews I have conducted as well as the documentation that I have reviewed.

6.  From interviews with METALDYNE employees, I have learned that METALDYNE CORPORATION is a leading designer and supplier of metal-based components, assemblies, and modules for the automotive industry.  METALDYNE operates approximately 50 facilities worldwide, employs approximately 7,500 employees, and is headquartered in Plymouth, Michigan.  One of METALDYNE's more profitable divisions is the SINTERED COMPONENT DIVISION, which manufactures automotive components such as connecting rods and bearing caps from powdered metal.

7.  Furthermore, I have learned that there are very difficult engineering challenges involved in the use of powdered metal to manufacture large components such as connecting rods for truck engines.  However, after investing over ten years and multiple millions of dollars in research and development, METALDYNE has successfully developed a proprietary process for manufacturing such large components with powdered metal.  This process affords METALDYNE a substantial advantage over competitors because powdered metal rods require far fewer post-forging machining operations, and can therefore be produced at significantly less cost than rods forged using traditional methods.

8.  Furthermore, I have learned that METALDYNE is one of only two automotive suppliers in the world known to possess the capability of producing powdered metal connecting rods for large truck engines.  GKN SINTER METALS, headquartered in Auburn Hills, Michigan, is the only other supplier with these capabilities.  However, GKN and their licensees are known to use different manufacturing processes than METALDYNE.  TOYOTA produces powdered metal connecting rods internally for use on its truck engines.  METALDYNE has licensed its proprietary powder metal manufacturing technology to only one other company under the protection of a Confidentiality Agreement.

9.  Furthermore, I have learned that METALDYNE has chosen to protect the various pieces of intellectual property inherent in its powdered metal manufacturing process as trade secrets rather than through the patent process.  This

3

is because patents on manufacturing techniques, as opposed to actual manufactured products, are notoriously difficult to enforce.

10.  Furthermore, I have learned that METALDYNE has taken reasonable steps to protect these trade secrets.  For example, METALDYNE requires its raw material suppliers to sign agreements that forbid them from disclosing confidential information.  METALDYNE's standard agreement with its raw material suppliers states in part "Supplier shall keep all confidential and proprietary information of Buyer in strictest confidence, and further agrees not to disclose or permit disclosure to others, or use for other than the purpose of the Agreement any confidential or proprietary information.  Supplier shall protect Buyer's confidential and proprietary information using the same degree of care with which it protects its own confidential information, but in no event less than reasonable care."

11.  Furthermore, METALDYNE requires the vendors from which it purchases capital equipment for use in its manufacturing processes to sign contracts that forbid them from disclosing confidential information.  METALDYNE's standard contract with its capital equipment suppliers states in part "Supplier agrees to keep all Confidential Information of Buyer in strictest confidence, and further agrees not to disclose Confidential Information or permit its disclosure to others, or use Confidential Information for other than the purpose of this Contract.  Supplier agrees to protect Buyer's Confidential Information using the same degree of care with which it protects its own confidential information, but in no event less than reasonable care." This contract further states in part "Any developments, devices, or technical information furnished in connection with the Equipment or resulting from development of the Equipment shall not be disclosed to anyone other than authorized personnel of Buyer."

12.  Furthermore, METALDYNE corporate policy explicitly states in part that "Employees are prohibited from accessing, distributing or publishing trade secrets or proprietary information of the company, its affiliates or any entity with which the company has a business relationship through the use of the Company Systems without proper authorization.  If trade secrets or other proprietary information is lost, disclosed to unauthorized parties, or suspected of being lost or disclosed, you must

4

notify your supervisor immediately." A written document outlining this policy is provided by METALDYNE to all employees upon the initiation of their employment with the company.

13. Furthermore, based on my review of METALDYNE's written corporate policy documents pertaining to physical security, computer passwords, and business conduct, I have learned that METALDYNE takes reasonable measures to protect its confidential information from both physical theft and from compromise via unauthorized electronic and/or computer access. Furthermore, METALDYNE does not allow photographs to be taken within its manufacturing plants without the permissions of the plant manager. Furthermore, whenever METALDYNE embarks on a new technology development program, the company always asks that a Confidentiality Agreement be signed prior to presenting such developments to customers, suppliers, or other external entities. Even with a signed Confidentiality Agreement, METALDYNE never discloses manufacturing process data or cost information in such presentations.

14. Furthermore, I have learned that METALDYNE's engineering drawings ("blue prints") are maintained on a computer network drive, and that access to this drive is restricted to a single office. Paper copies of such drawings are maintained in file cabinets in this office under the supervision of the engineers.

15. Furthermore, I have learned that METALDYNE redacts and removes any proprietary and confidential information pertaining to its manufacturing processes from the process control plans and other documentation that it is contractually obligated to provide to its customers. Furthermore, as stated above, the technology and process for METALDYNE's powdered metal manufacturing has been licensed to only one other company, under strict non-disclosure and confidentiality requirements.

16. Furthermore, I have learned that METALDYNE requires employees, such as the defendants, ANNE LOCKWOOD and FUPING LIU, to sign confidentiality agreements as a prerequisite for entering into employment with METALDYNE. These agreements explicitly forbid them from disclosing proprietary information or trade secrets without authorization. Finally, METALDYNE does not allow employees to have access to or knowledge of entire machine designs,

manufacturing process details, and internal cost information unless such information is required for that employee to carry out his or her duties.  Indeed, LOCKWOOD was one of the few employees working at METALDYNE who, as a high-level manager, had access to all of these different types of confidential information.

17.  Furthermore, I have learned that METALDYNE SINTERED COMPONENTS operates a manufacturing facility in North Vernon, Indiana that produces connecting rods for a major customer, INTERNATIONAL TRUCK AND ENGINE.  The North Vernon facility has been producing connecting rods for INTERNATIONAL since 1999.  METALDYNE has been designing a new connecting rod for INTERNATIONAL to replace the rod currently in production.  This new rod is in the prototype phase and is not scheduled to go into production at the North Vernon facility until June 2006.  This new rod has been custom designed for INTERNATIONAL's 2007 Model Year 6.4L V8 Power Stroke engine.

18.  Furthermore, I have learned that the INTERNATIONAL connecting rod manufacturing process operating at METALDYNE's North Vernon facility requires the use of certain pieces of capital equipment that were custom designed and engineered specifically for this production line.  For example, the North Vernon facility uses two presses that were custom-designed by MUELLER-WEINGARTEN of Weingarten, Germany specifically for the INTERNATIONAL connecting rod process.  These are the only two presses of their kind in the world, and are not published in MUELLER-WEINGARTEN's sales literature.  Similarly, the North Vernon process uses two furnaces custom designed by PACIFIC INDUSTRIAL FURNACE COMPANY (PIFCO) of Wixom, Michigan.  These two furnaces are also the only two of their kind in the world.

19.  Furthermore, I have learned that ANNE LOCKWOOD entered into employment with MASCO INDUSTRIES, INC., a subsidiary of MASCO CORPORATION, in September 1989.  MASCO INDUSTRIES later changed its name to MASCOTECH, INC., and in 2000 to METALDYNE CORPORATION.  Over the years LOCKWOOD rose through the ranks of METALDYNE and was eventually promoted to the position of Vice President of Sales in October 2003.  Shortly after this promotion, LOCKWOOD became involved in increasingly greater disputes with other members of METALDYNE's senior executive management team.

20.  I have obtained via Federal Grand Jury Subpoena a copy
of LOCKWOOD's confidentiality agreement with METALDYNE,
then named MASCO CORPORATION.. This agreement was signed by
LOCKWOOD in September 1989, and states in part "I will not,
without written approval by an officer of Masco, disclose,
publish or authorize anyone else to disclose or publish,
either during the term of such employment or subsequent
thereto, except as required in the performance of my duties
as an employee of Masco, any information of Masco, its
affiliated companies, or others including, but not limited
to, Masco Industries, Inc. and its divisions and
subsidiaries."

21.  LOCKWOOD's agreement with METALDYNE further states in
part that "Such information shall include any confidential,
proprietary or trade secret information of Masco, its
affiliated companies or others, acquired by me in the
course of my employment by Masco, and upon leaving the
employ of Masco, I will not take with me without the
written consent of one of Masco's officers any documents or
other things embodying or recording any such confidential,
proprietary or trade secret information."

22.  LOCKWOOD's agreement with METALDYNE further states in
part that "It is understood that such confidential,
proprietary or trade secret information shall include, but
is not limited to, confidential, proprietary, or trade
secret information of Masco, its affiliated companies and
others concerning products, developments, equipment,
machines, manufacturers, inventions, discoveries, patent
applications, ideas, designs, formulae, compositions,
processes, methods, research, sales information, licensing
and investment opportunities, acquisition and joint venture
candidates, business practices and processes, compilations
of information and customers as well as confidential,
proprietary or trade secret information relating to the
management, operation, financial affairs, planning or other
business opportunities of Masco, its affiliated companies,
and others."

23.  LOCKWOOD's agreement with METALDYNE further states in
part that "This Agreement shall inure to the benefit of and
be enforceable by Masco and its successors and assigns and
shall be binding upon me and my legal representatives."

24.  Based on interviews with METALDYNE employees, I have
learned that FUPING LIU entered into employment with the

SINTERED COMPONENTS DIVISION of METALDYNE, then named
MASCOTECH INC., in March 1998.  LIU began his METALDYNE
employment at its North Vernon, Indiana facility.  After
several years, LIU was transferred to METALDYNE SINTERED
COMPONENTS' headquarters facility in Michigan and reported
directly to LOCKWOOD.  In the first quarter of 2003, LIU
was transferred to a new office that METALDYNE was opening
in Shanghai, China.  LIU was based in METALDYNE's Shanghai
office until he submitted his resignation on April 8, 2004.

25.  I have obtained via Federal Grand Jury Subpoena a copy
of FUPING LIU's confidentiality agreement with METALDYNE,
then named MASCO CORPORATION, signed by LIU in March 1998.
This agreement states in part "MascoTech Sintered
Components, Inc., a subsidiary of Masco Corporation, having
a place of business in North Vernon, Indiana, is involved
in the production of forged powder metal internal
combustion engine connecting rods.  During the course of
your involvement and employment you may be exposed to
certain confidential and proprietary information concerning
this subject.  Disclosure or misuse of this information by
the undersigned would cause substantial and irreparable
harm to MascoTech Sintered Components proprietary
information that is the basis for a substantial
Masco/MascoTech Sintered Components business activity.  By
your signature, you agree to hold this information in trust
and confidence and shall restrict circulation of any
information within this organization on a need-to-know
basis and shall not, without the specific written consent
of an office of Masco or MascoTech Sintered Components, use
the information other than for the benefit of Masco or
MascoTech Sintered Components or disclose this information
to any third party."

26.  LIU's confidentiality agreement with METALDYNE further
states in part that "It is agreed that, if employment or
association with Masco and MascoTech Sintered Components
terminates for any reason whatsoever, any and all
information shall be returned to Masco and MascoTech
Sintered Components.  Any violation of the above
restrictions shall immediately serve as grounds for
termination and for appropriate legal action to protect
MascoTech Sintered Components and Masco's interests."

## THE COMPROMISE OF METALDYNE TRADE SECRETS

27. From interviews with METALDYNE employees, I have
learned that on August 3, 2004, MUELLER-WEINGARTEN, a
supplier of manufacturing equipment to METALDYNE, received
an unsolicited email message from an individual who
identified himself as SUN JIN, a representative of
CHONGQING HUAFU INDUSTRY CORPORATION.  HUAFU is a
manufacturer of powdered metal automotive components based
in the city of Chongqing in the People's Republic of China.
METALDYNE provided to me a copy of this message, which
states that HUAFU is planning to launch a new program to
manufacture powdered metal connecting rods.  HUAFU
requested that MUELLER-WEINGARTEN provide HUAFU a quotation
for a turnkey proposal for a production line to manufacture
such rods.

28. In order to aid MUELLER-WEINGARTEN in the drafting of
the requested production line proposal, SUN JIN attached
three documents to his email message.  Two of these
documents are Microsoft Word documents, and the third is a
mechanical part drawing created with the software package
AUTOCAD.

29. The first Word document is entitled "equipment list
and cost.doc".  Based on interviews with METALDYNE
employees, I have learned that this document describes in
detail the set of capital equipment comprising METALDYNE's
North Vernon production line that manufactures the
INTERNATIONAL connecting rod.  The document contains
accurate information on the cost and throughput of each
piece of capital equipment in METALDYNE's manufacturing
process, as well as detailed engineering and technical
notes regarding such equipment.  METALDYNE employees whom I
have interviewed have identified the information contained
within this document as confidential METALDYNE information
and trade secrets.

30. The second Word document is entitled "process flow for
rod.doc".  This document contains even more detailed
technical information and specifications on METALDYNE's
entire process for manufacturing the INTERNATIONAL
connecting rod.  METALDYNE employees whom I have
interviewed have also identified much of the information
contained within this document as confidential METALDYNE
information and trade secrets.

31. The third document is entitled "pf conrod.dwg".  Based
on interviews with METALDYNE employees, I have learned that

this document consists of a detailed mechanical drawing
("blue prints") of the prototype INTERNATIONAL connecting
rod that METALDYNE has designed for INTERNATIONAL's Model
2007 truck engine.  With the exception of typographical
errors, the written notes on the mechanical drawing match
exactly with the notes on a copy of METALDYNE's internal
drawing of that part that METALDYNE has provided to me.
These notes even include the phrase "procurement of this
forging is limited to metaldyne sintered componennts.north
vernon,indiana".

32.  Based on interviews with an employee of ABBOTT
FURNACE, another supplier of manufacturing equipment to
METALDYNE, I have learned that on August 3, 2004, ABBOTT
FURNACE also received an unsolicited email message from the
same HUAFU representative, SUN JIN.  This email message
also includes identical copies of the three attached
documents sent to MUELLER-WEINGARTEN containing METALDYNE
trade secrets.

33.  Employees of both MUELLER-WEINGARTEN and ABBOTT
FURNACE recognized the information contained within the
attached documents as being confidential METALDYNE
information.  Both companies notified METALDYNE and
provided copies of the attached documents to METALDYNE.

34.  Based on my interviews of GIORGIO LANNI, employed by
METALDYNE as the Director of Business Development &
Engineering, I have learned that LANNI is intimately
involved in METALDYNE's INTERNATIONAL connecting rod
program.  LANNI had previously reported to LOCKWOOD.  LANNI
examined the documents attached to the two aforementioned
emails from HUAFU.  After reviewing the set of individuals
who might have had access to this information, including
himself, LANNI concluded that LOCKWOOD was most likely the
only individual who would have had access to the complete
set of trade secrets in totality contained within the three
documents.  To the best of LANNI's knowledge, no former
employee, customer, or supplier, other than LOCKWOOD, would
have had access to the complete set of information
contained within the three email attachments.

35.  Based on my interviews of WILLIAM HEIDT, employed by
METALDYNE as the Senior Manufacturing Engineer responsible
for the North Vernon production line, I have learned that
HEIDT is also intimately involved in the INTERNATIONAL
connecting rod program.  HEIDT examined the aforementioned

documents sent by HUAFU.  HEIDT also concluded that, with
the possible exception of himself, LOCKWOOD was the only
METALDYNE employee who would have had access to the
complete set of trade secrets, taken in total, contained
within the three documents.

36. LANNI identified to me one specific METALDYNE trade
secret contained in the HUAFU messages as the capital cost
and throughput of each piece of equipment within the
INTERNATIONAL rod production line.  This data cannot be
obtained directly from METALDYNE's capital equipment
suppliers because it takes into account numerous factors
beyond their knowledge.  Furthermore, this data is not made
available to METALDYNE's customers.  LANNI identified the
most likely original source of this information as a
specific internal METALDYNE document referred to as a "cost
sheet".  Such cost sheets are generated and maintained by
only one or two METALDYNE employees within the financial
controller's office.  Access to these cost sheets is
forbidden unless the controller electronically sends a copy
of the sheet to an employee with a legitimate business need
to know this information.  To the best of LANNI's
knowledge, LOCKWOOD was one of only a small set of
METALDYNE employees who was granted access to these cost
sheets.  I have examined the particular internal METALDYNE
cost sheet referred to by LANNI and have seen that much of
the confidential cost and throughput information contained
in that cost sheet is also present in the attachment to the
email sent by HUAFU.

37. LANNI and HEIDT also identified to me the
specification of the MUELLER-WEINGARTEN screw press model
number and gross working capacity as METALDYNE trade
secrets that were both contained within the HUAFU
documents.  To the best of LANNI's and HEIDT's knowledge,
LOCKWOOD was one of only a small set of METALDYNE employees
who would have had access to this information.

38. LANNI and HEIDT also identified to me the gross
heating capacity of the PIFCO rotary furnace as a METALDYNE
trade secret contained within the HUAFU documents.  To the
best of LANNI's and HEIDT's knowledge, LOCKWOOD was one of
the few METALDYNE employees who would have had access to
this information.

39. LANNI also identified to me the entire AUTOCAD drawing
of the prototype INTERNATIONAL connecting rod part as a

METALDYNE trade secret.  Detailed mechanical drawings of parts that are already in production are not generally considered to be trade secrets because a competitor could obtain such information by purchasing the part and then taking careful dimensional measurements.  However, drawings of parts that are still in the prototype phase, such as METALDYNE's new connecting rod custom designed for the 2007 Model Year INTERNATIONAL engine, are considered to be trade secrets and are treated accordingly by METALDYNE.

40.  LANNI tasked one of his engineers to compare the drawing sent by HUAFU with METALDYNE's internal drawing of the prototype connecting rod.  Based on their knowledge of the trade, LANNI and his engineer reached the conclusion that the HUAFU drawing had been re-generated using the AUTOCAD software from a paper drawing generated by METALDYNE from its part drawing stored in electronic form. METALDYNE's own mechanical part drawings are produced using a different software package from AUTOCAD, which also suggests that the HUAFU drawing was re-generated from a paper drawing.

41.  LANNI informed me that he had visited HUAFU in Chongqing, China, in 2002 as part of METALDYNE's initial search for a joint venture partner in China for the manufacture of main bearing caps (MBCs).  METALDYNE was not interested in developing a partnership with a Chinese supplier for the manufacture of connecting rods because it considers this market segment to be too vital to its core business to outsource.  No METALDYNE trade secrets were disclosed to HUAFU during this business trip.

42.  Furthermore, LANNI informed me that during his visit to HUAFU, LANNI formed the opinion that HUAFU did not possess the technology necessary to produce powdered metal connecting rods, nor was it close to developing such technology.  Indeed, based on his observations at HUAFU, LANNI believed that HUAFU was years away from developing such technology on its own.  HUAFU expressed great interest in developing a partnership with METALDYNE in order to manufacture powdered metal connecting rods.  METALDYNE rebuffed this interest and eventually selected a different supplier as its main bearing cap joint venture partner in China.

43.  BEN SCHMIDT, the Vice President and General Manager of METALDYNE SINTERED COMPONENTS, has provided information to

me that indicates that substantial independent economic
value derives from the METALDYNE trade secrets were
compromised. This is because METALDYNE has invested
millions of dollars and more than a decade of research into
the development of the technology embodied by these trade
secrets.  If a competitor were to obtain this technology,
it is possible that METALDYNE's share of the powdered metal
connecting rod market would be reduced, and METALDYNE
derives substantial income from its current share of this
market.  The North Vernon INTERNATIONAL connecting rod
program alone generates millions of dollars in sales
annually for METALDYNE.  However, the total economic loss
resulting from the compromise such trade secrets would be
much greater because this proprietary manufacturing
technology is utilized in many of METALDYNE's other
production lines.

## LOCKWOOD'S DEALINGS WITH HUAFU

44.  Based on interviews with METALDYNE employees, I have
learned that LOCKWOOD's last day at METALDYNE was February
23, 2004.  I have also learned that the final date of
FUPING LIU's employment at METALDYNE was April 9, 2004.
Shortly after his resignation from METALDYNE, LIU accepted
employment with GKN SINTER METALS (GKN), a major competitor
to METALDYNE.  LIU currently works out of GKN's Shanghai,
China office.

45.  Based on my analysis of documents I have obtained from
the Michigan Secretary of State's office, I have learned
that on June 18, 2004, LOCKWOOD submitted Articles of
Incorporation to the Michigan Secretary of State to
incorporate a business entity known as PP SALES AND
ENGINEERING."  LOCKWOOD was listed as the sole registrant
of this corporation.  The registered address of PP SALES
AND ENGINEERING is 1076 Avon Circle, Rochester Hills,
Michigan 48309.  On June 22, 2004, PP SALES AND ENGINEERING
was officially incorporated by the State of Michigan.
Based on my analysis of public records obtained via LEXIS-
NEXIS, I have learned that LOCKWOOD resides at this
address.  The LEXIS-NEXIS report summarizes results from
various public data bases.  I have also obtained an image
of LOCKWOOD's Michigan Driver License, which lists her
address as 1076 Avon Circle, Rochester Hills, Michigan.
This location was also confirmed by METALDYNE officials as
the address given by LOCKWOOD as her residence.

46.  Based on documents obtained pursuant to a Federal
Grand Jury subpoena, I have learned that LOCKWOOD also
opened a new business checking account with BANK ONE under
the name of PP SALES AND ENGINEERING on July 1, 2004.
LOCKWOOD was listed as "President" of PP SALES AND
ENGINEERING on the account documents.

47.  Based on my analysis of the contents of FUPING LIU's
METALDYNE email account, I have learned that LIU has good
personal relationships with HUAFU.  For example, there were
25 email messages between LIU and SUN JIN stored in LIU's
METALDYNE email folders.  As noted above, SUN JIN is a
representative of HUAFU, and was identified as the sender
of the e-mail messages to MUELLER-WEINGARTEN and ABBOTT
FURNACE containing attached documents that METALDYNE has
identified as trade secrets.

48.  Based on information obtained from YAHOO pursuant to a
Federal Grand Jury subpoena, I have learned that the YAHOO
email address lockwoa@yahoo.com is registered to LOCKWOOD,
and that the YAHOO email address fupingliu2@yahoo.com is
registered to FUPING LIU.

49.  Based on information obtained from the execution of a
federal search warrant issued by the Eastern District of
Michigan targeting the contents of the YAHOO email accounts
lockwoa@yahoo.com and fupingliu2@yahoo.com, I have learned
that LOCKWOOD and FUPING LIU formulated a plan in which
LOCKWOOD would act as a commercial agent for HUAFU.
Specifically, LOCKWOOD sent LIU an email message on April
26, 2004 containing a document entitled "Commercial Agent
Agreement".

50.  This "Commercial Agent Agreement", which I have
reviewed, appears to be a contract between HUAFU and PP
SALES AND ENGINEERING (PPSE).  The contract lists the
address of PPSE as 1076 Avon Circle East, Rochester Hills,
Michigan 48309.  This contract states in part that HUAFU
appoints PPSE to act as its exclusive agent for sintered
products to all Industrial OEMs and Automotive Tier 1/Tier
2 customers in the territory of the United States.  Based
on my interviews of METALDYNE employees, I have learned
that "sintered products" refers to powdered metal
components, such as the INTERNATIONAL connecting rod that
METALDYNE currently produces at its North Vernon plant.

51. This contract further states in part that "PPSE has the task to handle sales business with interested parties within the territory for HUAFU."  The contract further states in part that "PPSE shall take care of the interests of HUAFU with the diligence of a responsible business person."  The contract further states that "PPSE shall also give advice and assistance to HUAFU's personnel during visits in the USA and when requested by HUAFU during visits of customers in China including the necessary interpreting activities."

52. The contract further states in part that PPSE shall receive a sales commission in the amount of 5% of all product sales for contracts negotiated with the help of PPSE, and that this commission shall be paid for seven years.  The contract further states in part that HUAFU will pay PPSE's monthly expenses pertaining to the sales of HUAFU products, such as travel costs and customer entertainment.  The contract further states in part that the agreement will enter into force on June 1, 2004.

53. Based on an analysis of the contents of LOCKWOOD's and FUPING LIU's YAHOO email accounts, I have learned that FUPING LIU sent an email message to SUN JIN of HUAFU and to LOCKWOOD on May 1, 2004.  This email served to introduce LOCKWOOD to SUN JIN and exchange each other's email addresses and telephone numbers.  This email message states in part "Anne, your contact person at Huafu is Mr. Jin Sun."  This message further states in part "Mr. Sun's direct boss is Mr. Qing-An Li, a good friend of mine and the prime owner of Huafu.  Mr. Jin Sun - Anne has been my direct boss for many years in US.  She will be working on the US side to obtain export business for Huafu."

54. Furthermore, I have learned that on May 12, 2004 LOCKWOOD sent an email message to SUN JIN, with a copy to FUPING LIU, in which she introduced herself and stated in part that she looks "forward to begin to introduce Huafu to potential customers in the United States."  She further states in part "I will be scheduling a trip to China in early June and look forward to a visit to Huafu".

55. Furthermore, I have learned that LOCKWOOD sent an email message to FUPING LIU on May 17, 2004, in which she states that she has been in discussions with INTERNATIONAL about developing a cheaper alternative source for their Model Year 2007 connecting rod, currently supplied by

METALDYNE.  LOCKWOOD states in part "I would VERY much like to see if we can determine a source that would be willing to work with us on this development."  LOCKWOOD further states in part "The rewards would be SUBSTANTIAL as would be the opportunities opened to us and the new supplier.  I have some meetings scheduled with Navistar after I return from China to discuss the trip and the opportunities." Based on interviews with METALDYNE employees, I have learned that "Navistar" is a moniker commonly used to refer to INTERNATIONAL TRUCK AND ENGINE based on this company's previous corporate name.  LOCKWOOD further asks "Can we find a couple potential p/f suppliers during my visit to China?"  Based on interviews with METALDYNE employees, I have learned that the abbreviation "p/f" refers to "powder forged", which describes the type of sintering technology METALDYNE uses to manufacture the INTERNATIONAL connecting rod.

56.  Furthermore, I have learned that LOCKWOOD sent an email message to FUPING LIU on May 18, 2004, in which she reiterated her desire for herself and FUPING LIU to provide assistance to HUAFU so as to develop HUAFU into a supplier of connecting rods to INTERNATIONAL, and thus replace METALDYNE.  Her email message states in part "We would both stand to gain quite a bit from this, Fuping.  If a Chinese company does not get involved now, two things could happen: 1) Forged steel continues to grow in popularity, since China can and will supply those rods, and 2) MD and GKN will be first to market in China with the rod, giving them a prime position."  Based on my knowledge of this investigation, I know that the terms "MD" and "GKN" refer to METALDYNE and GKN SINTER METALS, a METALDYNE competitor and FUPING LIU's employer from the time he resigned from METALDYNE to the present.

57.  Based on records obtained from the United States Bureau of Immigration and Customs Enforcement, I have learned that LOCKWOOD departed the United States on a flight outbound for Tokyo, Japan on May 28, 2004, and returned to the United States on a flight inbound from Tokyo, Japan on June 6, 2004.

58.  Based on records obtained pursuant to a Federal Grand Jury subpoena, I have learned that a charge of $73.56 was posted to LOCKWOOD's AMERICAN EXPRESS card on June 1, 2004 from "LI YUAN HOTEL CHONGQING CHINA".  Based on my analysis of public corporate records obtained via LEXIS-NEXIS, I

have learned that CHONGQING HUAFU INDUSTRIAL CORPORATION is based in the city of Chongqing, China.

59. Based on an analysis of the contents of LOCKWOOD's YAHOO email account, I have learned that LOCKWOOD sent an email message to ANGIE HATHAWAY on the evening of June 1, 2004. Based on my interviews of METALDYNE employees, I have learned that HATHAWAY is currently employed by METALDYNE and is known to be a friend of LOCKWOOD. LOCKWOOD's email message states in part "Hey – remember when you moved my files on the netork to somewhere 'safe' from Pete Rogers? Did you ever move them back to my user folder? If not, can you? I would like to have Michael access my old files...he said there is not much there now." Based on my interviews with METALDYNE employees, I have learned that PETE ROGERS was a former METALDYNE employee. I have also learned in my investigation that LOCKWOOD is married to MICHAEL HAEHNEL, who was then and is now an employee of METALDYNE. I therefore believe that the "Michael" referred to in the above message as the person LOCKWOOD wants to access her old files is most probably LOCKWOOD's husband, MICHAEL HAEHNEL. LOCKWOOD further states "Well, Angie, let me know about the files, if you are okay with it."

60. Furthermore, I have learned that HATHAWAY responded to LOCKWOOD via email and stated in part "I'm guessing that I would've moved them to your Z: drive. I will need to get to them from the office. Tomorrow I will try to figure out how to get to them!" Based on interviews with METALDYNE employees, I have learned that the term "Z: drive" refers to private network folders assigned to each METALDYNE employee.

61. Furthermore, I have learned that LOCKWOOD then responded to HATHAWAY via email on June 2, 2004 and stated in part "RE: files...thanks for your help on this...I know I have some old gems on my old files...I just have no clue where they are!!!!" LOCKWOOD further responded in part "Anyway, things went EXTREMELY well in China. Please do not share this with ANYONE – GPT has been snooping around asking about my activities and MD can screw things up in the next 2 weeks if they get a whff of what I am trying to attempt. After 30 days, I am free and clear of MD influence." Based on my investigative findings, I have learned that "GPT" refers to GEORGE THANOPOULOS, LOCKWOOD's former supervisor at METALDYNE. LOCKWOOD further states

that "I am not working through GSO in Indy - I am going direct to the manufacturers. I signed 2 LOIs this week." Based on my knowledge of business practices, I know that the term "LOI" refers to a letter of intent. Based on my investigative findings, I have learned that "GSO" refers to GLOBAL SOURCE ONE, a firm with whom LOCKWOOD had had discussions in April and May 2004 regarding the importation of HUAFU manufactured components into the United States.

62. Furthermore, I have learned that on June 6, 2004 SUN JIN sent an email message to FUPING LIU and LOCKWOOD in which he stated "I've recv'd the signed papers concerning 'Letter of Intent', please check the attached letter, which has been approved by Mr. Li qingan already." Based on my analysis of FUPING LIU's email messages, I have learned that QING AN LI is the general manager of HUAFU and SUN JIN's supervisor.

63. Furthermore, I have learned that on or before June 8, 2004 LOCKWOOD sent an email message to SUN JIN, with a copy sent to FUPING LIU, in which she stated in part "Thank you for the signed document. I am anxious to start work! I am meeting with International Navistar this week (June 10) to review our approach on the powder forged connecting rod." LOCKWOOD further stated in part "I will return to China in mid-July to work on our development plan (I will be forwarding additional information to you.)"

64. Furthermore, I have learned that LOCKWOOD sent an email message to FUPING LIU no later than June 13, 2004 in which she stated that "I am going to forward the connecting rod stuff this evening, and let's see if Huafu wants to work with a 3.50USD price CIF West Coast."

65. Based on telephone toll records and customer information obtained pursuant to a Federal Grand Jury subpoena, I have learned that LOCKWOOD is the registered customer for telephone number 248-650-1666, and that a phone call was initiated from this number to international telephone number +86-23-6521-9459 on June 11, 2004. The aforementioned introductory email message from FUPING LIU sent on May 1, 2004 stated that LOCKWOOD's fax number is 248-650-1666, and that SUN JIN's fax number is 23-6521-9459. I know that 86 is the international country code assigned to the People's Republic of China. Based on these facts, I believe that LOCKWOOD faxed information to SUN JIN on June 11, 2004. The customer information also shows that

the telephone number that sent the fax to SUN JIN is physically located at 1076 Avon Circle East, Rochester Hills, Michigan 48309, the residence of LOCKWOOD and the business address of PP SALES AND ENGINEERING.

66. Based on an analysis of the contents of LOCKWOOD's and FUPING LIU's YAHOO email accounts, I have learned that SUN JIN sent an email message to FUPING LIU on June 18, 2004 stating in part "attached please check the breakdown lists about the Navisatr's conrod.  Mr. Wangping would like to make a phonecall to you for further discussion."  This email message contained two attached documents written in the Chinese language.  Based on the results of a translation performed by an FBI contract linguist, as well as an interpretation of this document by a METALDYNE employee, I have learned that the first document consists of a quotation from HUAFU to PP SALES AND ENGINEERING for the production of the INTERNATIONAL connecting rod currently being developed by METALDYNE.  This document quotes a sales price of $3.25 per rod.  From my interviews with METALDYNE employees, I have learned that this price substantially undercuts the current price that METALDYNE is charging INTERNATIONAL for connecting rods.  The quotation further states that LOCKWOOD will receive a sales commission of approximately $0.137 per connecting rod.

67. The second attached document consists of a spreadsheet that itemizes the individual pieces of capital equipment, utilized within METALDYNE's manufacturing process for the INTERNATIONAL connecting rod, along with their associated capital expense costs and production capacities.  Based on an analysis of the English translation of this document performed by an FBI contract linguist, I have learned that the pieces of capital equipment listed in this Chinese document match those listed in the aforementioned document "equipment list and cost.doc" transmitted via email by SUN JIN to MUELLER-WEINGARTEN and ABBOTT FURNACE on August 3, 2004.  Furthermore, this Chinese document includes much of the capital equipment cost and production capacity information contained within the confidential internal METALDYNE "cost sheet" document mentioned above.  These positive matches were based on the fixed conversion rate of 8.26 to 1 between the Chinese currency and the United States dollar.  LANNI has identified this document as containing confidential METALDYNE information and trade secrets.

68. Furthermore, I have learned that LOCKWOOD sent an email message to FUPING LIU on or before June 21, 2004 stating in part "As we discussed, I would like to propose the following to International for the supply of the 2007 connecting rod: 3.30 USD, ex works (Chongqing) 240K USD prepayment of L1 tools ASAP; 240K USD payment of L2 tools @ PPAP approval."  Based on my interviews with METALDYNE employees, I have learned that "L1" and "L2" tools refer to different stages within the prototype development process for a new part, and that "PPAP" refers to final customer approval of a new part.  The message further states in part "Fuping: On top of this, to assist Huafu, I would be willing to work on a graduated scale for our commission.  I would be willing to take 1% for the first 3 years of production (assuming you would take 1%, for a total of 2%); and 1.5% for the last 2 years of the program (total: 3%)."

69. Furthermore, I have learned that FUPING LIU sent an email message to SUN JIN on June 21, 2004.  The content of this message consisted solely of the words "Forging tools".  This message had an attached file entitled "Forging tool.ppt", which consisted of a Microsoft Powerpoint document containing a high quality digital image of industrial tools labeled "Forge Perishable Tooling."  LANNI identified this image as depicting tooling equipment custom designed for the manufacture of METALDYNE's 3842 FORD Essex connecting rod.  LANNI described the image as confidential and proprietary METALDYNE information that would not be allowed to be disclosed outside the company without authorization from the plant manager.

70. Furthermore, I have learned that FUPING LIU sent another email message to SUN JIN on June 21, 2004.  The content of this message consisted solely of the words "Molding tool".  This message had an attached file entitled "Molding tool.ppt", which consisted of a Microsoft Powerpoint document containing a high quality digital image of industrial tools labeled "Molding Perishable Tooling." LANNI identified this image as depicting tooling equipment custom designed for the manufacture of METALDYNE's 3842 FORD Essex connecting rod.  LANNI described the image as confidential and proprietary METALDYNE information that would not be allowed to be disclosed outside the company without authorization from the plant manager.

71. Furthermore, I have learned that LOCKWOOD sent an email message to SUN JIN and FUPING LIU on June 21, 2004

with subject line "International Connecting Rod – Cost Model Comparison".  In this message LOCKWOOD states in part "I have attached for your review a brief breakdown of the rods, Huafu and Metaldyne.  I took the MD info from a recent cost model (where they have obviously been very conservative – overestimating the capital and using a relatively low volume projection for the cost of capital)." Based on the results of my investigation, I believe that LOCKWOOD's term "cost model" refers to the aforementioned confidential "cost sheet" that METALDYNE employees have identified as containing METALDYNE trade secrets.  LOCKWOOD further states "Capex for Huafu I took from my sheet that I provided to Huafu, though for depreciation and overhead, I have used the numbers from Huafu's cost model".  The term "capex" refers to capital expenses for the various pieces of equipment required in the production of the INTERNATIONAL connecting rod, which METALDYNE employees have identified as confidential METALDYNE information.

72.  Furthermore, this email message contained an attached document entitled "COST COMPARISON HUAFU V MD.xls".  My analysis of this document revealed that it contains METALDYNE's connecting rod manufacturing costs as well as a breakdown of the various components of these costs.  LANNI has identified this document as containing confidential METALDYNE trade secrets.  For example, the document contains the correct price that METALDYNE pays for raw powdered metal material.  Based on my interview with LANNI, I have learned that this is a negotiated price that METALDYNE keeps strictly confidential, and that the disclosure of this price to competitors such as HUAFU would weaken METALDYNE's competitive advantage.

73.  Furthermore, I have learned that LOCKWOOD sent an email message to SUN JIN on June 22, 2004 that asked in part "Do I have a response that I can give International today?"  Furthermore, I have learned that SUN JIN replied to FUPING LIU via email on June 23, 2004 with a message that stated in part "Hello! Anne, I've got all your emails already, now our accounting team is auditing the breakdown cost model on Navistar program, will forward it to you once it's fixed.  Yet there are few items, I can't make sense, hopeful you might clear them in return."  SUN JIN's message then outlines a number of requests for additional information pertaining to METALDYNE's connecting rod manufacturing process.  LANNI has identified this requested information as confidential METALDYNE trade secrets.  For

example, HUAFU requests LOCKWOOD to provide the consumption
rate per connecting rod of a lubricant used by a sprayer
arm during the manufacturing process, and the price at
which METALDYNE is able to purchase this lubricant from the
supplier.  SUN JIN also requests that LOCKWOOD provide
HUAFU additional details on the capital equipment used to
produce the INTERNATIONAL connecting rod as follows:
"Capital investment: We hope to get your idea on our
proposal, let us know your assumption in terms of your rich
experience.  Actually, we don't know the processing
criterias for p/f conrod manufacture, but also what kind of
equipment would be the ideal one to run Navistar's rod."
FUPING forwarded this email message to LOCKWOOD on June 23,
2004.

74.  Furthermore, I have learned that FUPING LIU sent an
email message to LOCKWOOD on June 25, 2004 that stated
"Anne, Attached is the current PF Conn Rod cost structure
at GKN.  Couldd you please review it carefully and comment
on it?  I will call you tonight (your Friday morning) to
discuss.  Thanks.  Fuping."  This email message contained
an attached document entitled "020204a fpm 7701-56.xls".
This document consists of a Microsoft Excel spreadsheet,
dated February 22, 2004, containing very detailed financial
and technical information regarding a GKN SINTER METALS
part number "FPM 7701-56" described as "Short Rod".  This
document contains dozens of pages of detailed cost and
production capacity information for the capital equipment
involved in one of GKN's connecting rod manufacturing
processes.  Based on my interviews with management
officials of GKN, I have learned that this information is
considered to be highly confidential by GKN and that GKN
takes reasonable measures to keep it secret.

75.  Furthermore, I have learned that FUPING LIU sent
another email message to LOCKWOOD on June 25, 2004 that
stated "Cost for Rod 2 Attached.  Fuping."  This email
message contained an attached document entitled "022004a
fpm 8301.xls".  This document consists of a Microsoft Excel
spreadsheet, also dated February 22, 2004, containing very
detailed financial and technical information regarding a
GKN SINTER METALS part number "FPM 8301-56" described as
"China Long Rod".  This document also contains dozens of
pages of detailed cost and production capacity information
for the capital equipment involved in one of GKN's
connecting rod manufacturing processes.  Based on my
interviews with management officials of GKN, I have learned

that this information is considered to be highly confidential by GKN and that GKN takes reasonable measures to keep it secret. In particular, I am aware that, among other measures, GKN has a security policy set out in its employees' manual which prohibits the disclosure of trade secrets such as the information contained in the above paragraphs.

76. Furthermore, I have learned that LOCKWOOD sent an email message to SUN JIN on July 3, 2004 in which she states that she has scheduled another trip to China to visit HUAFU, and that she will arrive in Chongqing on Tuesday July 27, 2004. LOCKWOOD further states in part that "With this schedule, we can meet with Huafu Wednesday through Friday, which will give us ample opportunity to finalize the development plan which will be presented to Navistar on August 3". LOCKWOOD further states in part "Lee Liu will be joining us as the Program Manager that will interface with International." Based on my analysis of several other email messages sent by LOCKWOOD, I have learned that LEE LIU is an engineer whom LOCKWOOD hired to work for her new business PP SALES AND ENGINEERING.

77. Based on my analysis of records obtained pursuant to a Federal Grand Jury subpoena, I have learned that LOCKWOOD used her AMERICAN EXPRESS card on July 2, 2004 to purchase three airline tickets from Detroit to Shanghai, China. The passenger names associated with these tickets were LOCKWOOD herself, LOCKWOOD's husband MICHAEL HAEHNEL, and LEE LIU.

78. Based on an analysis of the contents of LOCKWOOD's Yahoo email account, I have learned that SUN JIN sent a response to LOCKWOOD via email on or before July 6, 2004, in which he discusses the agenda for LOCKWOOD's upcoming trip to HUAFU. SUN JIN states that one agenda item shall be "Determine the feasibilities of our scheduled equipment lists, try anything we can to reason a practical budgetary estimate." SUN JIN also suggests that representatives from LAFCO, a capital equipment supplier, be invited to some of the upcoming meetings with LOCKWOOD because "We think it's more efficient for us to make clear of some open issues, like equipment feasibilities, throughput per shift, layout proposal, production line erection..." SUN JIN proposes an additional agenda item as follows: "Should we ask you to contact Kobelco U.S., to confirm if they can also work with Huafu @ the same purchase rate of MD, so as to fix the material problem in cost way." Based on my interviews with

METALDYNE employees, I have learned that KOBELCO is
METALDYNE's primary supplier of raw powdered metal material
for the INTERNATIONAL connecting rod.

79. Based on a forensic analysis of the aforementioned
documents "equipment list and cost.doc" and "process flow
for rod.doc" which were transmitted via email from SUN JIN
to MUELLER-WEINGARTEN and ABBOTT FURNACE on August 3, 2004,
I have learned that these two documents were created on
July 6, 2004.

80. Based on an analysis of the contents of LOCKWOOD's
Yahoo email account, I have learned that at some point in
time no later than August 18, 2004, LOCKWOOD sent an email
message to SUN JIN that included an attached document
entitled "Equipment List and Cost for PF Rod for
Huafu.doc". In this email message, LOCKWOOD discusses
detailed technical issues related to the capital equipment
required to manufacture the INTERNATIONAL connecting rod.
Based on LANNI's knowledge of the trade and his specific
knowledge of METALDYNE's connecting rod manufacturing
process, LANNI concluded from the content of this message
that LOCKWOOD had transmitted METALDYNE trade secrets
pertaining to the INTERNATIONAL connecting rod to HUAFU.
LANNI further concluded that HUAFU had then used these
trade secrets to generate a proposal for its own variation
upon METALDYNE's manufacturing process, and that LOCKWOOD
and SUN JIN were now discussing the differences between
METALDYNE's process and HUAFU's proposed variation on this
process. Furthermore, LANNI explicitly identified some of
the information transmitted by LOCKWOOD to SUN JIN in this
particular email message as METALDYNE trade secrets related
to the manufacture of the INTERNATIONAL connecting rod.
For example, LOCKWOOD disclosed to SUN JIN METALDYNE's
internal capital cost and throughput capacity for the
delube furnace used in its rod manufacturing process,
stating that this information is "based on the Metaldyne
process, which has proven to be a profitable one when
managed properly." These internal cost and throughput
values precisely match those present on the aforementioned
confidential METALDYNE cost sheet, and LANNI has identified
this information as confidential to METALDYNE. LOCKWOOD
further states in part "My strong recommendation is that
Huafu solicit quotations from PIFCO for the rotary hearth
sintering furnace and from Mueller Weingarten for the
forging press. All other equipment can be from alternate
sources, as long as the costs are equal to or less than

Metaldyne's costs.  I believe that outside of the sintering and the forging equipment, Huafu can find much more economical processing solutions.  I have amended the equipment cost estimate for the Metaldyne rod, it appears as though the PIFCO furnace is much lower than what was shown in earlier cost sheets.  The best thing to do is get a quote to verify the actual cost."  From my interviews with METALDYNE employees, I have learned that the PIFCO furnace and MUELLER-WEINGARTEN screw press discussed in this email message are custom pieces of equipment designed specifically for METALDYNE's INTERNATIONAL connecting rod manufacturing process.

81.  Furthermore, I have learned that SUN JIN responded to LOCKWOOD via email at some date no later than August 18, 2004.  SUN JIN's response stated in part "Hi Anne, Do you think Weingarten would love to quote on a turn-key production line with outsourcing rotary furnace from Pifco, U.S. and Delube Furnace from Abbott, U.S.?  Do you think there might be someone else in Germany, who is able to take over Pifco and Abbott's Furnaces?"

82.  Furthermore, I have learned that on August 18, 2004 LOCKWOOD responded to SUN JIN via email.  LOCKWOOD's response stated in part "Hi Sun Jin: As mentioned in my previous email, I would not worry about Abbott.  Weingarten is the ONLY forging press supplier to MD, so I would be concerned about using something else.  But let me do some inquiring."

83.  Furthermore, I have learned that LOCKWOOD sent an email message to an ELLEN LAVERDURE on August 18, 2004.  LOCKWOOD's message stated in part "I ended up getting a decent settlement from Metaldyne, which is helping me start my own business.  I am starting a sales and engineering office to represent companies from China who want to do business in North America.  I guess I wanted to get even with MD for their awful behavior."  LOCKWOOD further stated in part "One of the major products I will represent is direct competition against MD's largest and most profitable product.  They will not be able to compete against the Chinese!!!"

84.  Based on my interview of SCOTT JOHNSON, currently employed as a Director of Sales at METALDYNE SINTERED COMPONENTS, I have learned that JOHNSON reported to LOCKWOOD prior to her departure from METALDYNE in February

2004.  On the evening of September 22, 2004, LOCKWOOD and
JOHNSON met for dinner at a local restaurant at LOCKWOOD's
initiation.  At this meeting, LOCKWOOD raised the subject
of METALDYNE's compromised trade secrets.  LOCKWOOD
acknowledged to JOHNSON that she had been attempting to act
as a middleman between a Chinese powdered metal supplier
and current METALDYNE customer INTERNATIONAL TRUCK AND
ENGINE.  LOCKWOOD further acknowledged that she had visited
this Chinese company and that she had provided information
to them that would help them to develop as a competitor to
METALDYNE in the powdered metal connecting rod business.
However, LOCKWOOD denied that she had compromised METALDYNE
trade secrets.  JOHNSON asked LOCKWOOD for the name of the
Chinese company, but LOCKWOOD declined to provide this
information.  JOHNSON promptly reported this conversation
to the proper officials within METALDYNE.

## PROBABLE CAUSE

85. In conclusion, I have learned from my investigation
that during the course of her employment at METALDYNE,
LOCKWOOD had access to the complete set of METALDYNE trade
secrets pertaining to the INTERNATIONAL connecting rod that
are now known to be in the possession of HUAFU, and that
indeed she was one of the few individuals at METALDYNE with
access to the complete set of these trade secrets taken in
totality.  Furthermore, I have learned that LOCKWOOD and
FUPING LIU entered into a business arrangement with HUAFU
in which LOCKWOOD and LIU assisted HUAFU in the development
of the powder forged connecting rod for INTERNATIONAL TRUCK
AND ENGINE's Model Year 2007 engine, a product currently
under development by METALDYNE.  Furthermore, I have
learned that the terms of this business arrangement with
HUAFU provided LOCKWOOD and LIU with substantial financial
incentives in the event that HUAFU is able to develop the
capability of producing large powder forged connecting
rods.  Furthermore, I have learned that LOCKWOOD and LIU
used email to transmit confidential METALDYNE trade secrets
pertaining to this connecting rod to HUAFU.  Furthermore, I
have learned that following the termination of her
employment, LOCKWOOD requested the assistance of current
METALDYNE employees in obtaining access to internal
METALDYNE files.  I have also learned that FUPING LIU
transmitted confidential GKN information to LOCKWOOD and
others.  Based on these findings, I have probable cause to
believe that LOCKWOOD and FUPING LIU have committed

violations of Title 18, United States Code § 1832(a) pertaining to the theft of trade secrets.

86. Based on the foregoing, I have probable cause to believe that ANNE LOCKWOOD and FUPING LIU, defendants herein, violated Title 18, U.S.C. § 1832(a)(1), (a)(2), and (a)(5), by stealing, transmitting, and conspiring with one another to steal and transmit trade secrets as defined in Title 18 U.S.C. § 1839(3).


JEFFREY L. EDWARDS
Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me, this 31st day of January, 2005


Mona K. Majzoub
UNITED STATES MAGISTRATE JUDGE

27